Filed 4/4/14  P. v. DeJarlais CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062968 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. MH106082) |
| STEVEN DANIEL DEJARLAIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for the Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, A. Natasha Cortina, Brendon Marshall, Deputy Attorneys General, for the Plaintiff and Respondent.

After a jury found appellant Steven Daniel DeJarlais to be a sexually violent predator (SVP), the trial court committed him to the custody of the Department of State Hospitals for an indeterminate term under the Sexually Violent Predator Act (SVPA; Welf. & Inst. Code,[1] § 6600 et seq.)  DeJarlais contends:  (1) there was insufficient evidence to sustain the finding he is an SVP and, alternatively, the SVPA is void for vagueness; (2) the trial court erred in its oral instruction of the jury with CALCRIM No. 224; (3) the SVPA violates constitutional protections of due process, double jeopardy, and the bar on ex post facto punishment; and (4) this matter should be remanded to the superior court for a hearing regarding whether the SVPA violates the constitutional guarantee of equal protection in this particular case.  We affirm the judgment.

BACKGROUND

DeJarlais stipulated he was convicted of two qualifying offenses:  raping K.S. in 1994, and raping M.K. in 1996.  Additionally, based on a 1990 incident, he pleaded guilty to corporal injury to his spouse, T.D.  In 1990, he pleaded guilty to corporal injury to his cohabitant, D.G.

DeJarlais was paroled from prison in 2004, and met his next victim, J.G., in May 2005. One month after knowing her, he proposed marriage.  J.G. soon learned about DeJarlais's criminal history on the Internet.  Therefore, around July 22, 2005, she first told DeJarlais she was ending the relationship.  But DeJarlais pressured her into meeting two more times in July 2005.  On August 5, 2005, J.G. agreed to have sex with DeJarlais

---

[1]     All statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

one last time.  The next day, he went to her house uninvited, and she told him not to visit her home anymore.  On August 10, 2005, DeJarlais telephoned J.G., saying he was waiting at her apartment and wanted to talk to her.  In her apartment building's parking area, he grabbed her, shoved her against a car, and refused to let her leave, saying he loved her and wanted to marry her.  J.G. told him to leave her alone because she wanted to end the relationship.  The next night at about 11:00 p.m., DeJarlais climbed through J.G.'s apartment window, grabbed her and covered her mouth with his hand.  She was afraid to cry because her children were home and she was concerned about what he might do to them.  DeJarlais was drinking alcohol, and five or six times pretended to kiss her but forced alcohol into her mouth.  She became dizzy and vomited.  Afterwards, DeJarlais forcibly had sex with her three times, and remained in her room until 8:00 a.m. the next day.  At some unspecified subsequent date, police found DeJarlais lurking outside J.G.'s apartment, and he fled in his vehicle, hitting a police officer.  He was convicted of reckless driving, felony evasion of a law enforcement officer, and violation of parole, and sentenced to seven years in prison.

*Prosecution Experts*

Psychologist Timothy Salz testified that DeJarlais suffered from paraphilia not otherwise specified and antisocial personality disorder, noting that DeJarlais had repeatedly committed sexual offenses against his female sexual partners after they rejected him.  Dr. Salz explained that DeJarlais's history of violence started when he was ten years old and continued even after he had been convicted and incarcerated for sexual offenses, and while he was released on parole or probation.

3

Dr. Salz testified in reference to the SVPA (§ 6600, subd. (e)):  "Okay.  So this to me is the key feature to this case.  So the statute defines 'predatory' as an act directed towards a stranger, an acquaintance—a stranger, a casual acquaintance with whom no *substantial* relationship exists or an individual with whom a relationship has been established or promoted for the primary purpose of victimization."  (Emphasis added.)  In light of the statutory definition, Dr. Salz testified at length regarding his conclusion that a "substantial" and well-founded risk existed that DeJarlais would commit a predatory sexual act if he were released into the community:  "Unfortunately, neither the statute nor any of the legal cases that I know about or any of the consultants that I consulted with about on this were able to give any real solid—real clear guidance as to what constitutes a 'substantial' relationship.  [¶]  So I looked it up in the dictionary.  . . .  You get words like, 'of or having substance.  Real, actual, true, not imaginary, strong, solid, firm, considerable, ample, of considerable worth or value, important.' "

Dr. Salz analyzed DeJarlais's relationships with each victim and concluded that except for his marital relationship, the others were not substantial.  D.G. was a stripper or escort.  DeJarlais raped her after he caught her in bed with another man.  K.S.'s husband was overseas during her approximately one-year relationship with DeJarlais.  When K.S.'s husband returned home, she sought to end her relationship with DeJarlais, who raped her.  During DeJarlais's two-year relationship with M.K., she was living with her husband.  One day, as M.K. came home, DeJarlais was wearing a mask and surprised her in her yard, where he raped her.

4

Dr. Salz testified regarding DeJarlais's relationship with J.G.: "So they had been dating for, I guess, it turned out—in my report I wrote one month.  It turns out it was actually a couple of months.  After they were seeing each other for a month, he asked her to marry him.  She kind of went, 'Whoa, this is a little odd.'  She wasn't thinking the relationship was that substantial.  [Otherwise] she wouldn't have questioned him asking her to marry him."  Dr. Salz concluded DeJarlais's relationships were "intensely sexual relationships as opposed to . . . substantial relationships," noting that DeJarlais had told a defense psychologist, "All of our relationships were built on sex.  It was only physical.  I thought if we would have sex, they wouldn't leave me."

Dr. Salz clarified, "But the real question is, is [DeJarlais] likely to commit a predator [*sic*] offense in the future.  So the question becomes how well does he have to know someone before he would rape them, and I would suggest it doesn't have to be that well.  [¶]  I can certainly imagine Mr. DeJarlais going to a bar—I mean, he obviously can be very charming, and women are clearly attracted to him—and taking a woman home.  How many days or weeks would he have to know her before she rejected him, and he would rape her?  I don't think it would take that many days or weeks.  That's the clear question."

Psychologist Marianne Davis testified that DeJarlais suffered from depressive disorder not otherwise specified, paraphilia not otherwise specified, and antisocial personality disorder.  Regarding the paraphilia diagnosis, Dr. Davis stated "[DeJarlais] didn't rape just once.  We have five victims here.  Some are raped multiple times, and that's highly significant in the literature [about paraphilias]."  Dr. Davis added, "ordinary

men when faced with a partner who is distressed or crying or in pain, will lose their sexual arousal. They will not be able to maintain an erection with a distressed partner. Mr. DeJarlais clearly, except in one case, was able not only to maintain an erection but sometimes achieve erection and ejaculation and then go back and do it two more times in the space of one night."

Dr. Davis pointed out that DeJarlais exhibited a pattern of sexual violence spanning 16 years: "He hurt [the victims] more than was necessary to get them to . . . submit . . . to having sex with him. That he hurt them after the fact that he had sex with them." Dr. Davis concluded DeJarlais was likely to commit other sexually violent predatory acts. DeJarlais told her that since going to prison he had learned how to monitor himself and believed he was no longer as overpowering and aggressive as before. But that comment was a "red flag" to Dr. Davis, indicating DeJarlais had "limited insights" regarding his mental disorder. Dr. Davis also stated that although DeJarlais had completed an advanced anger management program in the past, he was subsequently paroled then reoffended against J.G. He also later violated prison rules by engaging in disruptive, violent conduct.

Dr. Davis, referring to J.G., concluded: "If [DeJarlais is] willing to start stalking a woman and behaving this way to her when he's only known her a month, I think that he could just as easily get out and do that to someone he's only known for a week. . . . That, to my mind, you, know, we're getting narrower and narrower in terms of our time frame, and how long it is before he victimizes a woman."

6

On redirect examination, Dr. Davis was asked, "Now, the fact that [DeJarlais and J.G.] knew each other for whether it was one month, two months, or three months, does that make a difference into [*sic*] your analysis on whether he's likely in the future to be at risk for committing another sexual offense that's predatory?" Dr. Davis replied, "No, it doesn't; that he—they had actually known each other longer than I knew from the original documents I was given did not leave [*sic*] me to change my opinion on that."

*Defense Experts*

Psychologist Mary Jane Alumbaugh testified that based on her interviews with DeJarlais and her document review, he manifested "antisocial behavior" and "sexual abuse of an adult." She clarified she did not regard either condition as a "treatable diagnosable disorder," but used those terms descriptively. Dr. Alumbaugh did not find that DeJarlais was likely to engage in predatory sex crimes, commenting that he had not done so in the past.

Defense counsel asked Dr. Alumbaugh to explain the basis of DeJarlais's sexual crimes. She replied that as a child, DeJarlais saw his father inflict domestic violence on his mother. Moreover, DeJarlais was twice sexually abused as a child. Dr. Alumbaugh concluded: "It is a combination of the modeling behavior of the violence in an intimate relationship and a combination layered on, a role model that was violent and he learned violence in the home modeling, and this kind of basic instability within the context of a relationship that when he is threatened with abandonment or separation, it triggers all of this. It just pulls the plug on this to be violent, to be sexual, because of the sexual abuse, and [the victim] will stay with [DeJarlais]. [¶] [His sexual violence] is only triggered

7

within the context of separation. I think what I want to say is on the outside Mr. DeJarlais looks like this big tough guy. Internally there's a whole lot of the little boy left that doesn't want to be left, wants to protect his mom, wants to keep his mom with him, and doesn't know what to do but act violently like dad did."

Psychologist Lisa Jeko testified that DeJarlais committed sexual abuse of an adult, and had antisocial personality disorder with narcissistic traits. She did not diagnose him with paraphilia. Dr. Jeko did not find that DeJarlais's prior sexual offenses were predatory nor believe that he would engage in future predatory sexual offense.

Both prosecution and defense experts who administered an actuarial instrument called the Static-99-R to determine DeJarlais's likelihood of engaging in sexually violent predatory behavior gave him a score of six, which puts him in the high risk range for reoffending. Both prosecution and defense experts also administered the PCL-R Hare psychopathy checklist to determine DeJarlais's level of personality disorder, and he scored between 27 and 30, which is considered in the high range for psychopathy. Dr. Davis concluded this score indicates, "Mr. DeJarlais is undeterred by consequences and that he's highly manipulative and can be very charming . . . making it much more likely that he'll be able to entice another woman into a relationship with him."

DISCUSSION

A.

DeJarlais contends there was insufficient evidence to support the finding he is an SVP. He acknowledges in his opening brief that the SVPA does not require that his past acts be predatory; rather, the SVPA only requires that a likelihood exist that his future

8

actions be predatory. Nonetheless, DeJarlais claims his relationships with his victims were substantial and he regards as baseless the prosecution experts' testimony regarding the likelihood he will reoffend. DeJarlais specifically argues: "The sufficiency of evidence issue, is whether 'rape paraphilia' can be inferred from horrible rapes disregarding victims' feelings, when there is no indication appellant was 'turned on' by their lack of consent, as opposed to not caring, as is true for garden-variety rapists. *It is about whether SVP law applies to a man who never raped any person with whom he had no substantial relationship*." (Emphasis added.) In his reply brief, DeJarlais formulates the same argument slightly differently: "[W]hile in a given case one may infer future predatory rapes from past sex offenses which are not predatory, it is not reasonable to draw that conclusion from someone who never raped anyone, outside what SVP law terms a 'substantial relationship.' . . . *Thus the best predictor here was that [he] would only rape women if substantial relationships went awry*. That makes him a criminal and a domestic abuser, not an SVP." (Emphasis added.)

*Applicable law*

I. *Statutory Background*

The SVPA provides for the involuntary civil commitment of persons who, in a unanimous jury verdict after trial, are found beyond a reasonable doubt to be SVP's. (§§ 6603, subds. (e) & (f), 6604.) The term " '[s]exually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal

9

behavior." (§ 6600, subd. (a)(1).) As originally enacted, the SVPA provided for a two-year commitment term. The SVPA now provides for an indeterminate term of confinement for persons who are found to be SVP's. (*People v. Shields* (2007) 155 Cal.App.4th 559, 562-563; §§ 6604, 6604.1.)

The Department is required to review the mental condition of a committed SVP at least annually, and the court may appoint an expert or the committed person may retain one. (§ 6604.9, subd. (a).) If the Department concludes the committed individual no longer meets the requirements of the SVPA, or that conditional release is appropriate, it must authorize the filing of a petition for release by the committed individual. (§ 6604.9, subds. (b) & (d).) After a probable cause hearing, if the court determines that the petition has merit, the committed person is entitled to a trial, with all constitutional protections as provided at the initial commitment hearing. At the trial, if the state opposes the petition, it must prove beyond a reasonable doubt that the committed individual remains an SVP. (§ 6605, subd. (a)(2) & (3).) If the trier of fact finds in the committed person's favor, the person must be unconditionally released and discharged. (§ 6605, subd. (b).)

In determining the sufficiency of the evidence to support a commitment under the SVPA, we apply the same test we apply when reviewing the sufficiency of the evidence to support a criminal conviction. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) "Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be ' "of ponderable legal significance . . . reasonable in nature, credible and of solid value." ' " (*Ibid*.) "In reviewing the record to determine

10

the sufficiency of the evidence[, we do not] reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.)

*Analysis*

Despite his protestations to the contrary, DeJarlais in effect is claiming the trier of fact must find the sexually violent offenses that qualify him for civil commitment to be predatory acts within the meaning of the SVPA. The California Supreme Court has rebuffed that contention. "[T]here is nothing in the statutory language or the legislative history to support this contention. The statutory scheme does not prohibit the trier of fact at the trial, in deciding whether the defendant is likely to commit sexually violent acts upon release, from taking into account past acts of sexual violence, even if the victims were not strangers, casual acquaintances, or persons cultivated for victimization. Even at the probable cause hearing, where the judge must find that the defendant is likely to commit *future* sexually violent *predatory* acts, the judge may take into account past convictions for sexual violence that did not involve 'predatory' acts as defined in section 6600. There is no point—neither in the preliminary screening, at the probable cause hearing, nor at the trial—where the [SVPA] requires a judicial determination that a defendant's *prior convictions* involved predatory conduct." (*People v. Torres* (2001) 25 Cal.4th 680, 684.) The Supreme Court adds, "The statutory scheme does not prohibit the trier of fact at the trial, in deciding whether the defendant is likely to commit sexually violent acts upon release, from taking into account past acts of sexual violence, even if the victims were not strangers, casual acquaintances, or persons cultivated for

11

victimization." (*Id.* at p. 686; accord, *People v. Roberge* (2003) 29 Cal.4th 979, 986-988.)

As noted, the record evidence supports the finding DeJarlais is likely to commit a predatory sexual offense if he is released to the community: Three psychologists, including a defense expert, testified that DeJarlais scored high on the actuarial instrument used to measure just such a likelihood. Further, DeJarlais was incarcerated and released on parole on different occasions, and was not deterred from committing sexual offenses. Dr. Davis testified in reference to J.G.'s case that the time between when DeJarlais meets a woman and victimizes her is narrowing. Dr. Davis also noted DeJarlais had not acquired sufficient insight into his violent behavior. As noted, Dr. Salz correctly identified the statutory requirements and testified regarding DeJarlais's likelihood of committing a violent sexual act with a stranger. The discussion regarding whether DeJarlais's past relations were substantial did not affect the analysis regarding the specific question of future offenses.

DeJarlais also argues, "Two defense experts said appellant was simply showing his sociopathic traits in raping the victims, like any domestic abuser or criminal might do. Neither saw any paraphilia, because neither saw evidence appellant was aroused by his victims' lack of consent, as opposed to being oblivious of it." However, in light of the substantial evidence supporting the jury's finding and the applicable standard of review, it is immaterial that defense experts reached a different conclusion. It is also unavailing that Dr. Salz used a dictionary to define the word "substantial," which appears in the SVPA. As noted, Dr. Salz correctly set forth the SPVA's requirement that he find

12

DeJarlais would commit future predatory sexual acts. " 'The credibility of the experts and their conclusions [are] matters [to be] resolved . . . by the [trier of fact],' and '[w]e are not free to reweigh or reinterpret [that] evidence.' " (*People v. Poulson* (2013) 213 Cal.App.4th 501, 518.)

## B.

DeJarlais alternatively contends that if the SVPA covers domestic violence offenses within the meaning of predatory sex offenses, then the law is void for vagueness. DeJarlais argues the prosecution's "central thesis" was that dysfunctional relationships were predatory because they were not "nourishing" or "solid." He further argues: "[B]oth prosecution experts . . . appeared to be finding that a short relationship such as a month or a few months, was either not 'substantial' within the meaning of that language; or it was to be deemed a basis for finding a risk of future 'predatory' sex offenses, because the victim was 'pulling away' and wanted out. In addition, both experts pointed to the defendant engaging in predatory behavior, in a more general sense, applicable to domestic abuse."

DeJarlais has forfeited this claim by failing to raise it in the trial court. (*In re Josue S.* (1999) 72 Cal.App.4th 168, 170-171 [" ' " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " ' ".].)

In any event, even if this issue were properly before us, we would reject it. The prosecution psychologists, in testifying that DeJarlais was likely to reoffend, correctly

13

applied the SVPA's definition of "predatory" at section 6600, subdivision (e), as follows: " 'Predatory' means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization."  As set forth above, despite questions at trial regarding the quality of DeJarlais's past relationships, the specific inquiry at trial was whether he would likely commit a predatory sexually violent act, and on that matter the two prosecution experts agreed, based on their actuarial assessments, the narrowing time period in which DeJarlais attacked his victims, and his inability to modify his conduct to avoid reoffending, despite having served time in prison and been placed on probation and parole.

## II.

DeJarlais contends the court committed reversible error by orally instructing the jury with an incomplete version of CALCRIM No. 224, which omitted the second paragraph.[2]  However, the jury received a complete instruction of CALCRIM No. 224. The California Supreme Court has ruled, "It is generally presumed that the jury was

---

2      The jury was given a complete written version of CALCRIM No 224, stating: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the respondent guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to find the respondent guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the respondent is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

guided by the written instructions.  [Citation.]  We indulge that presumption here."

(*People v. Davis* (1995) 10 Cal.4th 463, 542.)  The Supreme Court also has held: "[A]s

long as the court provides the jury with the written instructions to take into the

deliberation room, they govern in any conflict with those delivered orally."  (*People v.

Osband* (1996) 13 Cal.4th 622, 717 [describing some of the conflicts between the oral

and written instructions as "misstatements, each of a minor character"].)  Here, the

conflict or variance in the instructions—the omission of a paragraph from the oral

instruction—was corrected in the written instruction.  Therefore, we conclude there was

no prejudicial error.

### III.

Solely for purposes of potential federal court review, DeJarlais contends the SVPA

violates the federal Constitution's due process, ex post facto, and double jeopardy clauses.

As he acknowledges, the California Supreme Court has decided against his position on

these points.  We have considered DeJarlais's arguments in light of our Supreme Court's

opinion in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), and this court's final

opinion on remand in the same case, *People v. McKee* (2012) 207 Cal.App.4th 1325

(*McKee II*).  *McKee I* is binding on us.  (*Auto Equity Sales v. Superior Court* (1962) 57

Cal.2d 450, 455.)

### IV.

With respect to his equal protection challenge, DeJarlais argues he is entitled to an

individual assessment as to whether he should be subjected to an indeterminate term

when other civilly committed offenders are not, and the case should be remanded to the

15

trial court to make these findings in his specific case.  Because DeJarlais did not raise this fact-based claim before the trial court, we deem it forfeited on appeal.  (See *In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.)

   We also reject the claim on the merits.  In *McKee I,* the California Supreme Court stated that on remand the People would have an opportunity to prove that SVP's "as a class" pose a greater risk than similarly-situated offenders so as to justify indefinite commitment "at least as applied to McKee."  (*McKee I*, *supra*, 47 Cal.4th at pp. 1208, 1210.)  At the remand hearing, after an extensive evidentiary presentation, the trial court found the People had made the requisite showing, and on appeal this court affirmed the trial court's ruling.  (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1330-1331, 1348.)  In our decision on appeal, we concluded that the information presented by the People supported that SVP's as a class pose distinct dangers that permit them to be treated differently from other types of offenders, and our holding was not premised on McKee's particular characteristics.  (*Id.* at pp. 1340-1348.)  Given the scope of our holding, we reject DeJarlais's contention that he is entitled to an individualized determination of his equal protection challenge.  (Accord, *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864 [*McKee II 's* equal protection holding applies to "class of SVP's as a whole," not to Mr. McKee alone]; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1377-1378.)

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

AARON, J.